FILED
RICHARD W. HAGEL
CLERK OF COURT

2026 JUL -6  PM 3: 39

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

|  |  |
|---|---|
| WAJAHAT EFRIDI. <br><br> Plaintiff, <br><br> vs. <br><br> FAIRFIELD MEDICAL CENTER: MELISSA NEWMAN, in her individual and official capacities; MISSY CLUM, in her individual and official capacities; THERESA DYAR, D.O., in her individual and official capacities; MARK DARNELL, in his individual and official capacities; JOHN JANOSO, in his individual and official capacities; JOHN/JANE DOE INDIVIDUALS 1–10, <br><br> Defendant(s). | CASE NO.: **2:26 CV 0 8 0 2** <br><br> **CIVIL ACTION** <br><br> **JURY DEMAND REQUESTED** <br><br> **JUDGE** MARBLEY <br> **MAGISTRATE JUDGE** Shimeall |

## COMPLAINT

NOW COMES the Plaintiff. WAJAHAT EFRIDI, for his Complaint against Defendants, states as follows:

## NATURE OF THE CASE

1.     Plaintiff Wajahat Efridi brings this civil action against Fairfield Medical Center and individual defendants arising from his termination from the Graduate Medical Education residency program in violation of federal and state law. This action asserts claims under Title I and Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, 42 U.S.C. § 1983 (for deprivation of procedural due process under

color of state law), as well as related Ohio state-law claims including breach of contract, wrongful termination in violation of public policy, negligence, and negligent infliction of emotional distress. These claims arise from Defendants' failure to accommodate Mr. Efridi's known disabilities, denial of required procedural protections, retaliatory conduct, and a sudden and unjustified termination that foreseeably caused severe professional and psychological harm.

2.      Despite having actual knowledge of Mr. Efridi's protected disabilities, post-surgical physical limitations, prescribed medications, and acute bereavement following the death of a close family member, Defendants failed to engage in the interactive accommodation process required by law, failed to provide reasonable accommodations, and failed to follow their own residency policies governing remediation, discipline, and appeal. Instead, Defendants placed Mr. Efridi on administrative leave, advanced an unfounded drug-screening allegation later withdrawn, scheduled him into rotations without accommodation, and ultimately terminated him without notice, hearing, or opportunity to respond. As a direct and proximate result of Defendants' conduct, Mr. Efridi suffered the loss of his residency position, disruption of his medical career trajectory, reputational injury, loss of income and future earning capacity, and significant emotional and psychological distress requiring ongoing treatment.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Americans with Disabilities Act (42 U.S.C. § 12101

et seq.), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), and 42 U.S.C. § 1983, presenting federal questions. The Court also has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2) because Defendants reside in this District and a substantial part of the events, omissions, and resulting harm occurred within the Southern District of Ohio, Eastern Division, including at Fairfield Medical Center in Fairfield County.

## PARTIES

5. Plaintiff Wajahat Efridi is an adult resident of Clark County, Ohio, and was at all relevant times a medical resident employed by Defendant Fairfield Medical Center through its Graduate Medical Education (GME) program. Mr. Efridi was employed from July 1, 2023, until his termination on August 18, 2023.

6. Defendant Fairfield Medical Center is a healthcare institution headquartered at 401 N. Ewing Street in Lancaster, Ohio, and is believed to be a publicly affiliated entity operating under Ohio law. It is responsible for the administration of its residency training programs, employment practices, compliance with federal disability accommodation laws, and ensuring due process protections for medical residents.

7. Defendant Melissa Newman is, and at all relevant times was, an employee or agent of Fairfield Medical Center, serving as the supervisor for the Graduate Medical Education program. She is sued in her individual and official capacities.

8. Defendant Missy Clum is, and at all relevant times was, the Director of People Services at Fairfield Medical Center, responsible for overseeing human resources

matters including discipline, leave requests, and termination decisions. She is sued in her individual and official capacities.

9.  Defendant Theresa Dyar, D.O., is, and at all relevant times was, a physician affiliated with the GME program and author of the July 12, 2023, letter of counseling addressing Plaintiff's leave options. She is sued in her individual and official capacities.

10.  Defendant Mark Darnell is, and at all relevant times was, an employee or agent of Fairfield Medical Center who participated in approving or endorsing disciplinary action against Plaintiff. He is sued in his individual and official capacities.

11.  Defendant John Janoso is, and at all relevant times was, an employee or agent of Fairfield Medical Center who participated in approving or endorsing disciplinary action against Plaintiff. He is sued in his individual and official capacities.

12.  JOHN/JANE DOE INDIVIDUALS 1–10 are unknown employees, supervisors, administrators, or agents of Fairfield Medical Center whose identities are not yet confirmed but whose acts and omissions contributed to the violations and injuries alleged in this Complaint. Plaintiff will amend this pleading to identify and substitute these individuals when their identities become known through discovery.

13.  At all times relevant, each Defendant acted under color of state law and within the course and scope of their employment or agency with Fairfield Medical Center, and their actions and omissions are attributable to the institutional Defendant.

## FACTUAL BACKGROUND

14.  Plaintiff Wajahat Efridi is a medical graduate who entered into employment with Defendant Fairfield Medical Center as a first-year resident physician (PGY-1) in its

Graduate Medical Education program. His start date was July 1, 2023.

15. At the time of his employment, Plaintiff had a documented medical history including a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) and physical limitations arising from recent shoulder surgery. Plaintiff was prescribed medication, including a Schedule II controlled substance (Adderall), however, the medication had been held in connection with his surgery and was not listed as an active medication on his intake form. Plaintiff was receiving ongoing treatment for both physical and mental health conditions. His conditions were known to the institution through pre-employment medical intake forms and follow-up interactions with Employee Health Services.

16. In the weeks leading up to the program start date, Plaintiff also suffered the unexpected and traumatic death of his only brother. As a result, he was emotionally distressed but nevertheless attempted to fulfill his professional obligations and participate in orientation and clinical duties. After Plaintiff informed Defendants of the death of his only brother, Defendants requested a death certificate as proof of the death, adding unnecessary distress during an acute period of bereavement.

17. On Plaintiff's first day back after bereavement, Defendants immediately placed him on administrative leave. On or about July 5, 2023, Defendants attempted to terminate or remove Plaintiff from the program based on a drug-screen issue. Plaintiff protested the allegation and disputed the basis for any termination. The program then agreed that the drug-screen matter would be evaluated by a third party. The allegation was ultimately withdrawn, but the incident caused reputational harm, emotional distress, and institutional mistrust that was never meaningfully addressed.

18. On or about July 12, 2023, Dr. Theresa Dyar, Program Director, issued a formal letter of counseling identifying Plaintiff's personal hardships, absences during orientation, and recovery from surgery. The letter acknowledged the cumulative challenges affecting Plaintiff's adjustment and expressly proposed a formal leave of absence, including up to six weeks of paid leave under GME and ACGME policy. Although the July 12, 2023 letter offered Plaintiff up to six weeks of paid leave, Plaintiff took only approximately two weeks because Defendants' prior conduct—including the July 5 attempted termination based on the disputed drug-screen issue, his placement on administrative leave on his first day back, and escalating scrutiny—caused him to reasonably fear further retaliation and termination if he used the full leave period. Plaintiff therefore returned prematurely while still grieving the death of his only brother.

19. Despite this documented recognition of Plaintiff's fragile medical and emotional state—and a written offer of up to six weeks of paid leave—Defendants failed to provide the leave as a meaningful, protected, and non-retaliatory accommodation. Plaintiff took only approximately two weeks because he reasonably feared further retaliation and termination if he used the full period offered. He was then returned to a physically demanding night rotation without discussion of accommodations, remediation, or clinical restrictions arising from his recovery or disability status.

20. Plaintiff performed his assigned duties during the rotation without disciplinary notice, adverse documentation, or contemporaneous complaints. He was never placed on a Performance Improvement Plan (PIP) nor advised that his job performance was deficient.

21. On August 18, 2023—coinciding with Plaintiff's recently deceased brother's birthday—Defendants issued a termination letter alleging "substandard performance" and claiming, for the first time, that Plaintiff had falsified a clinical examination note by documenting a heart murmur that he had not personally heard. Plaintiff was not provided any prior notice, opportunity to respond, or evidentiary hearing before his termination.

22. The termination letter was executed by multiple institutional officials, including Defendants Melissa Newman, Missy Clum, Mark Darnell, and John Janoso. It referenced no prior disciplinary history aside from generalized concerns and relied on an isolated allegation of misconduct without any formal investigation or due process.

23. Plaintiff immediately requested clarification of his right to appeal under the GME program's policy and the applicable disciplinary code. Despite the program's published policy granting residents the right to appeal termination decisions, Defendants refused to permit any form of grievance, appeal, or peer review, stating that no such process was available at the termination level.

24. As a direct result of Defendants' actions, Plaintiff lost his medical residency position, suffered reputational damage in the tightly knit medical community, was denied eligibility to reapply for positions in the next Match cycle, and has experienced severe emotional distress, including depression, anxiety, and disrupted treatment plans.

25. Plaintiff has since engaged in continued psychological treatment and has attempted to mitigate his losses through job searches and administrative remedies.

However, Defendants' conduct has irreparably harmed his medical career trajectory and professional standing.

### Violation of the Americans with Disabilities Act (ADA), Title I

### 42 U.S.C. § 12112 et seq.

### (Against All Defendants)

26.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

27.     At all relevant times, Plaintiff Wajahat Efridi was a "qualified individual with a disability" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12102, in that he had one or more physical and mental impairments—including Attention Deficit Hyperactivity Disorder (ADHD), post-surgical physical limitations, and related mental health conditions—that substantially limited one or more major life activities, including concentration, sleep, and the performance of physical tasks.

28.     Defendant Fairfield Medical Center was, at all relevant times, an "employer" within the meaning of the ADA, 42 U.S.C. § 12111(5), and employed Plaintiff as a resident physician through its Graduate Medical Education program.

29.     Plaintiff was qualified to perform the essential functions of his position as a resident physician, with or without reasonable accommodation. Plaintiff successfully completed medical school, entered residency through the Match, and was capable of performing his duties with reasonable accommodations consistent with accepted medical training practices.

30.     Defendants had actual knowledge of Plaintiff's disabilities and related

limitations. Plaintiff disclosed his conditions through pre-employment medical intake forms, communications with Employee Health Services, and direct discussions with supervisory and GME personnel. Defendants further acknowledged Plaintiff's medical and emotional circumstances in written correspondence, including the July 12, 2023 counseling letter.

31.     Despite this knowledge, Defendants failed to engage in the interactive process required by the ADA to identify and implement reasonable accommodations. Defendants did not meaningfully discuss accommodations, did not provide the leave proposed in the July 12, 2023 letter in a protected or non-retaliatory manner, and did not modify Plaintiff's schedule, workload, or rotation assignments to account for his documented limitations.

32.     Instead of accommodating Plaintiff, Defendants subjected him to adverse actions, including placing him on administrative leave on his first day back after bereavement, attempting to terminate or remove him on or about July 5, 2023 based on a disputed drug-screen issue later referred for third-party evaluation and withdrawn, assigning him to a physically demanding night rotation without accommodation, and ultimately terminating his employment.

33.     Plaintiff's termination on August 18, 2023, constituted an adverse employment action taken because of his disabilities and/or his need for reasonable accommodation, in violation of 42 U.S.C. § 12112(a).

34.     Defendants further violated the ADA by failing to make reasonable accommodations for Plaintiff's known disabilities, in violation of 42 U.S.C. §

12112(b)(5)(A), including but not limited to failing to provide meaningful and adequate protected leave, failing to allow Plaintiff to safely use the full six-week leave offered in the July 12, 2023 letter without fear of retaliation or termination, failing to provide modified duties, schedule adjustments, or a remediation plan consistent with Plaintiff's limitations.

35. Defendants' conduct also created and perpetuated a discriminatory and hostile work environment based on disability, marked by heightened scrutiny, stigmatization, and punitive responses to disability-related limitations, rather than lawful accommodation.

36. At all relevant times, Defendants acted intentionally, willfully, recklessly, or with deliberate indifference to Plaintiff's federally protected rights under the ADA.

37. As a direct and proximate result of Defendants' violations of the ADA, Plaintiff has suffered and continues to suffer economic damages, including lost wages and future earning capacity; non-economic damages, including emotional distress, humiliation, and mental anguish; and other compensable harms.

38. Plaintiff is entitled to all relief available under the ADA, including compensatory damages, equitable relief, reinstatement or front pay, back pay, attorneys' fees, costs, and such other relief as the Court deems just and proper pursuant to 42 U.S.C. § 12205.

**COUNT II – Violation of Section 504 of the Rehabilitation Act of 1973**

**29 U.S.C. § 794**

**(Against All Defendants)**

39.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

40.     Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of his disability, be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

41.     At all relevant times, Defendant Fairfield Medical Center operated its Graduate Medical Education residency program as a "program or activity" within the meaning of the Rehabilitation Act and received federal financial assistance, including but not limited to Medicare and Medicaid funding.

42.     Plaintiff Wajahat Efridi was, at all relevant times, an individual with a disability within the meaning of the Rehabilitation Act, as defined in 29 U.S.C. § 705(20), in that he had documented physical and mental impairments—including ADHD, post-surgical physical limitations, and related mental health conditions—that substantially limited one or more major life activities.

43.     Plaintiff was otherwise qualified to participate in and benefit from the residency program. He met the academic, professional, and licensing prerequisites for residency and was capable of performing the essential functions of his position with reasonable accommodations.

44.     Defendants had actual knowledge of Plaintiff's disabilities and related limitations through pre-employment medical intake documentation, communications with Employee Health Services, supervisory personnel, and written correspondence

acknowledging Plaintiff's medical and personal circumstances.

45. Despite this knowledge, Defendants excluded Plaintiff from continued participation in the residency program, denied him the benefits of training and employment, and subjected him to adverse actions—including administrative leave, stigmatizing scrutiny, and termination—solely by reason of his disability and the limitations associated with it.

46. Defendants failed to provide reasonable accommodations necessary to ensure Plaintiff's equal access to and participation in the residency program, including but not limited to meaningful and adequate protected leave, modified duties, scheduling adjustments, and a lawful remediation or accommodation process.

47. Defendants further failed to engage in any meaningful interactive process to identify or implement accommodations, despite acknowledging Plaintiff's disabilities and proposing accommodation-related options in writing.

48. Defendants' actions were intentional, knowing, and carried out with deliberate indifference to Plaintiff's federally protected rights, satisfying the standard for compensatory damages under the Rehabilitation Act.

49. As a direct and proximate result of Defendants' violations of Section 504 of the Rehabilitation Act, Plaintiff has suffered substantial damages, including loss of employment and training opportunities, interruption of his medical career, lost income and future earning capacity, emotional distress, reputational harm, and ongoing psychological injury.

50. Plaintiff is entitled to all relief available under the Rehabilitation Act,

including compensatory damages, injunctive and equitable relief, attorneys' fees and costs pursuant to 29 U.S.C. § 794a(b), and such other relief as the Court deems just and proper.

## COUNT III – Deprivation of Procedural Due Process

## 42 U.S.C. § 1983

### (Against All Individual Defendants in Their Individual Capacities)

51.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

52.    At all relevant times, Defendants Melissa Newman, Missy Clum, Theresa Dyar, Mark Darnell, and John Janoso were acting under color of state law as employees or agents of Fairfield Medical Center, a public or quasi-public institution receiving substantial public funds and operating in close affiliation with the State of Ohio.

53.    Plaintiff held a constitutionally protected property interest in continued participation in his residency program, which was governed by institutional policies and practices that provided for discipline only upon cause, progressive steps, and an opportunity to be heard. The structure of the Graduate Medical Education program, as well as Plaintiff's contractual and statutory rights, created a reasonable expectation of continued employment absent sufficient procedural safeguards.

54.    Plaintiff also possessed a liberty interest in pursuing his chosen profession as a physician. Defendants' actions—including abrupt termination without hearing and stigmatizing allegations of dishonesty—foreclosed Plaintiff's ability to pursue residency in future programs, triggered reportable events under licensing and credentialing systems,

and damaged his professional reputation.

55. Defendants deprived Plaintiff of both property and liberty interests without providing constitutionally adequate due process, including: No prior notice of alleged performance deficiencies; No opportunity to respond to allegations before termination; No formal investigation of misconduct; No opportunity to appeal, grieve, or otherwise challenge the termination decision; No access to peer review or neutral fact-finding as promised under internal GME policy.

56. Defendants' conduct directly contravened Plaintiff's clearly established constitutional rights under the Fourteenth Amendment to the United States Constitution, including the right not to be deprived of property or liberty without due process of law.

57. Each of the individual Defendants participated in, approved of, or failed to intervene in the termination decision, and each had actual or constructive knowledge that Plaintiff was being terminated without constitutionally required safeguards.

58. These violations were not the result of mere negligence or isolated error, but of deliberate or reckless disregard for Plaintiff's clearly established rights, entitling Plaintiff to compensatory damages and, if supported by the evidence, punitive damages.

59. As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered substantial economic loss, reputational harm, and emotional distress, and he is entitled to judgment pursuant to 42 U.S.C. § 1983, including damages, attorneys' fees under 42 U.S.C. § 1988, and all other relief deemed appropriate by this Court.

## COUNT IV – WRONGFUL TERMINATION IN VIOLATION OF PUBLIC

## POLICY

### (Against Defendant Fairfield Medical Center)

60.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

61.     Under Ohio law, an employer may be held liable for wrongful termination when the discharge of an employee contravenes a clear public policy, as set forth in the common law or a statutory source.

62.     Plaintiff's termination violates Ohio's clearly established public policies favoring: The prevention of disability discrimination (e.g., as codified in Ohio Rev. Code § 4112.02); The accommodation of qualified individuals with disabilities; The protection of employees who request or utilize accommodations; The right to be free from retaliatory discharge for engaging in protected activity under the ADA, Rehabilitation Act, and analogous Ohio statutes.

63.     Plaintiff was engaged in protected activity when he: Disclosed his ADHD and post-surgical limitations; Requested medical leave and/or accommodations; Provided documentation supporting his need for support or modification of duties; Sought clarification of internal appeal rights following adverse action.

64.     Rather than accommodate or support Plaintiff in accordance with clearly expressed legal and ethical mandates, Defendant Fairfield Medical Center terminated him on August 18, 2023—shortly after these protected actions—without notice, remediation, or opportunity to respond.

65.     Plaintiff's discharge was retaliatory, lacked just cause, and violated the

State of Ohio's well-defined public policies embodied in Ohio's antidiscrimination laws and reinforced by federal statutory protections.

66.     No overriding business justification existed for the termination. To the contrary, Plaintiff had not received any formal progressive discipline, was performing his clinical duties, and had been previously offered leave as an appropriate course of action.

67.     Plaintiff's termination under these circumstances undermines the effective enforcement of the State of Ohio's civil rights framework and the rights of employees to engage in protected conduct without fear of reprisal.

68.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer economic harm, reputational damage, mental anguish, and loss of future employment and training opportunities.

69.     Plaintiff is entitled to all relief available under Ohio law, including compensatory damages, back pay, front pay or reinstatement, punitive damages where appropriate, attorneys' fees, and all other relief deemed just and proper by this Court.

## COUNT V – BREACH OF CONTRACT

### (Against Defendant Fairfield Medical Center)

70.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

71.     At all relevant times, Plaintiff was a party to a valid and enforceable employment agreement with Defendant Fairfield Medical Center, formed in connection with his appointment as a resident physician in the Graduate Medical Education (GME) program beginning July 1, 2023.

72. In addition to any formal residency contract or offer letter, Plaintiff's employment relationship was governed by the GME Program Manual, institutional policies and procedures, and other documents which collectively set forth the terms, conditions, and expectations of the residency program. These documents constituted binding promises and formed part of the contractual relationship between Plaintiff and Defendant.

73. The GME Program and its parent institution promised, among other things: To follow progressive disciplinary procedures; To provide notice and an opportunity to respond before adverse action; To consider leave options, remediation, and performance plans before termination; To offer a fair and impartial appeal process in the event of proposed dismissal.

74. Defendant Fairfield Medical Center materially breached the terms of the residency agreement and governing policies by: Terminating Plaintiff without prior written warning, remediation plan, or performance review; Denying Plaintiff any opportunity to present his side of the story before termination; Refusing to provide access to the appeal or grievance process described in the GME policy documents; Failing to honor the full purpose and protection of its own written offer of up to six weeks of paid leave; Terminating Plaintiff based on vague or post hoc allegations without substantiating evidence.

75. Plaintiff at all times complied with the terms of his employment and acted in good faith. He continued performing clinical duties, attempted to mitigate challenges related to bereavement and recovery, and made timely and good-faith requests for

support, clarification, and appeal.

76.     Defendant's breach of contract was not minor or technical. It went to the heart of the residency relationship and directly deprived Plaintiff of the opportunity to remediate, to be heard, and to continue his career trajectory through the expected duration of training.

77.     As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages including but not limited to loss of employment, lost wages, lost career opportunity, reputational harm, emotional distress, and diminished future earning capacity.

78.     Plaintiff is entitled to all remedies available for breach of contract under Ohio law, including compensatory damages, expectation damages, consequential losses, attorneys' fees (where permitted), and such other relief as this Court deems just and proper.

## COUNT VI – Breach of the Implied Covenant of Good Faith and Fair Dealing

## (Against Defendant Fairfield Medical Center)

79.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

80.     Under Ohio law, every contract carries an implied covenant of good faith and fair dealing. This covenant requires that neither party to a contract do anything that will deprive the other of the benefits of the agreement.

81.     Plaintiff entered into an employment contract with Defendant Fairfield Medical Center in connection with his appointment as a medical resident in the Graduate

Medical Education (GME) program.

82.    That agreement was governed not only by the express terms of the employment offer and program manual, but also by the implied duty of good faith and fair dealing in the administration of disciplinary processes, performance evaluations, leave considerations, and termination decisions.

83.    Plaintiff reasonably relied on Fairfield Medical Center's representations, written policies, and practices regarding the right to remediation, due process before adverse action, and access to internal appeal or grievance mechanisms.

84.    Defendant breached the covenant of good faith and fair dealing by acting in a manner designed to deprive Plaintiff of the benefit of the contractual relationship, including: Offering up to six weeks of paid leave in writing but failing to provide that leave in a meaningful, protected, and non-retaliatory manner; Scheduling Plaintiff into a night rotation with no regard for his recovery or limitations after he returned prematurely; Terminating him without warning, remediation, or opportunity to respond; Denying him access to a promised appeal process while falsely representing that none was available.

85.    Defendant's actions were arbitrary, retaliatory, and contrary to the spirit of fairness, mutual respect, and support that undergirded the physician-resident training relationship.

86.    The termination was timed and executed in a manner that disregarded Plaintiff's vulnerable emotional state and deprived him of a meaningful opportunity to preserve his standing in the profession.

87.    As a direct and proximate result of Defendant's breach of the implied

covenant, Plaintiff suffered damages including lost wages, career disruption, reputational harm, emotional distress, and diminished earning capacity.

88. Plaintiff is entitled to all remedies available under Ohio law, including compensatory damages, consequential damages, equitable relief, and such other relief as this Court deems just and proper.

## COUNT VII – Negligent Infliction of Emotional Distress

### (Negligent Infliction of Emotional Distress)

89. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

90. Under Ohio law, a defendant may be held liable for **negligent infliction of emotional distress** where the defendant's conduct foreseeably causes serious emotional distress to a person of ordinary sensibilities, particularly where the plaintiff is either the direct victim of the negligent conduct or was placed in fear of physical harm due to the defendant's actions.

91. Defendants owed Plaintiff a duty to exercise reasonable care in handling his employment, medical information, disability accommodation, and any disciplinary or termination actions arising out of his participation in the Graduate Medical Education (GME) program.

92. Defendants breached that duty through a series of negligent acts and omissions, including but not limited to: Requiring Plaintiff to provide a death certificate after he reported the death of his only brother; mishandling the disputed drug-screen issue, including attempting to terminate or remove Plaintiff on or about July 5, 2023

before the matter was referred for third-party evaluation and later withdrawn; Offering up to six weeks of paid leave in the July 12, 2023 letter but failing to provide that leave in a meaningful, protected, and non-retaliatory manner while knowing Plaintiff was recovering from surgery and grieving the recent death of his only brother; Assigning Plaintiff to a demanding night shift rotation without accommodations or any assessment of his post-surgical limitations; Terminating Plaintiff abruptly on August 18, 2023, without prior notice or warning, and on a personally significant date, thereby compounding the emotional harm; Publicly labeling Plaintiff as dishonest and unfit for medical practice without conducting a formal investigation or affording him due process; Denying Plaintiff access to any appeal or review process, even after acknowledging its availability in institutional policy.

93.     Defendants knew or should have known that Plaintiff was particularly vulnerable to emotional distress given the recent death of his only brother, ongoing mental health treatment, physical recovery, and the importance of the residency program to his career and future livelihood.

94.     As a direct and foreseeable result of Defendants' negligent actions and omissions, Plaintiff has suffered serious emotional distress, including depression, anxiety, loss of sleep, social withdrawal, and ongoing psychological trauma, all of which have required continuing treatment and support from medical professionals.

95.     Plaintiff was the direct victim of Defendants' negligent conduct, and his emotional distress is serious and medically documented—not trivial, fleeting, or speculative.

96. Plaintiff is entitled to recover damages under Ohio law for the emotional harm caused by Defendants' negligence, including compensatory damages, the costs of mental health treatment, and such other relief as this Court deems just and proper.

## COUNT VIII – Retaliation in Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act

### (Against All Defendants)

97. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

98. The Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act prohibit covered entities from retaliating against individuals who engage in protected activity, including requesting reasonable accommodations for a disability or asserting rights under the law.

99. At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA and Section 504. His diagnoses of ADHD, post-surgical physical limitations, and related mental health conditions were known to Defendants and acknowledged in internal documentation.

100. Plaintiff engaged in protected activity by: Disclosing his disabilities during the onboarding process; Requesting accommodations related to his recovery and mental health; Participating in interactive discussions with GME leadership; Following institutional protocols related to disability disclosure; Requesting clarification about his right to appeal the termination decision under GME policy.

101. Rather than accommodate Plaintiff or engage in good faith with his

requests, Defendants took adverse employment actions in close temporal proximity to his protected activity, including: Falsely accusing him of failing a drug screen based on his prescribed medication; Failing to provide leave offered in a meaningful, protected, and non-retaliatory manner; Assigning him to a physically demanding rotation despite known limitations; Terminating him without progressive discipline, remediation, or peer review.

102. The timing and circumstances of Plaintiff's termination—less than six weeks after his disability was formally documented and following his repeated attempts to secure accommodation—support a strong inference of retaliatory motive.

103. Defendants' actions were intentional and taken in direct response to Plaintiff's protected activity, in violation of the ADA's anti-retaliation provision (42 U.S.C. § 12203) and the Rehabilitation Act's retaliation protections.

104. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered loss of employment, loss of income, reputational harm. emotional distress, and lasting professional damage.

105. Plaintiff is entitled to all available relief under the ADA and Rehabilitation Act, including reinstatement or front pay, compensatory damages, attorneys' fees and costs pursuant to 42 U.S.C. § 12205 and 29 U.S.C. § 794a, and any other relief deemed just and proper by this Court.

## COUNT IX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

106. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

107. Under Ohio law, a claim for intentional infliction of emotional distress requires proof that the defendant, by extreme and outrageous conduct, intentionally or recklessly caused the plaintiff to suffer serious emotional distress.

108. Defendants' conduct toward Plaintiff was extreme, outrageous, and far beyond the bounds of decency in a professional employment setting, particularly in a hospital and medical training environment where compassion and duty of care are fundamental.

109. Despite knowing that Plaintiff was recovering from surgery, grieving the recent loss of his only brother, managing a documented mental health condition, and relying on prescribed medication, Defendants: Required Plaintiff to provide a death certificate after he reported his brother's death; attempted to terminate or remove Plaintiff on or about July 5, 2023 based on a disputed drug-screen issue before the matter was referred for third-party evaluation and later withdrawn; Withdrew the drug allegation without apology or correction to Plaintiff's record; Offered up to six weeks of paid leave in writing but failed to provide that leave in a meaningful, protected, and non-retaliatory manner; Caused Plaintiff to reasonably fear retaliation and termination if he used the full leave period, forcing him to return after approximately two weeks while still grieving and emotionally vulnerable; Reassigned Plaintiff to a demanding night rotation without considering physical or emotional limitations; Abruptly terminated him without prior notice, progressive discipline, or investigation; Executed the termination on a date personally significant to Plaintiff, his recently deceased brother's birthday, with no attempt to accommodate his vulnerable condition; Denied Plaintiff access to any appeal,

grievance, or peer review process; Accused Plaintiff of dishonesty in a clinical record without investigation, documentation, or a chance to respond, thereby harming his professional reputation..

110. This pattern of conduct was calculated, retaliatory, and carried out with reckless disregard for the foreseeable impact on Plaintiff's mental health, professional future, and emotional stability.

111. Defendants' conduct caused Plaintiff to suffer severe and medically documented emotional distress, including depression, anxiety, panic, suicidal ideation, social isolation, and psychological trauma requiring ongoing mental health treatment.

112. Plaintiff's emotional distress was serious and debilitating, going far beyond the ordinary stresses of employment, and was both foreseeable and proximately caused by Defendants' outrageous and intentional misconduct.

113. Defendants acted willfully, wantonly, and with malice or reckless disregard for Plaintiff's rights and well-being, warranting an award of punitive damages in addition to compensatory relief.

114. Plaintiff is entitled to recover damages under Ohio law for intentional infliction of emotional distress, including compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in their favor and against Defendants as follows:

a. Declaratory Relief, declaring that Defendants' actions violated Plaintiff's rights

under the Americans with Disabilities Act, the Rehabilitation Act, the Fourteenth

Amendment to the U.S. Constitution, and Ohio law;

b. Injunctive Relief, including but not limited to:

1. Reinstatement into the Graduate Medical Education residency program (or, in the alternative, front pay);

2. An order requiring Defendants to expunge Plaintiff's personnel record of all references to discipline, termination, or alleged misconduct;

3. Institutional reforms to ensure non-discriminatory administration of accommodations and disciplinary policies;

c. Compensatory Damages, including but not limited to:

1. Back pay and lost benefits;

2. Loss of future earnings and career advancement;

3. Medical and psychological treatment costs;

4. Emotional distress, pain and suffering, mental anguish, and reputational harm;

d. Consequential and Special Damages stemming from disruption to Plaintiff's medical training and professional trajectory;

e. Punitive Damages against individual Defendants for conduct undertaken with malice or reckless disregard for Plaintiff's federally protected rights;

f. Prejudgment and Postjudgment Interest on all monetary awards, as permitted by law;

g. Attorneys' Fees and Costs, including expert witness fees, under 42 U.S.C. §§ 1988, 12205, and 29 U.S.C. § 794a, or as otherwise provided by law;

h.  Any and all other relief, at law or in equity, that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

## CERTIFICATION

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.


_____

Wajahat Efridi
Pro Se

4024 Chakeres Ave.
Springfield, OH 45505

Tel: (614)441-7520
Volcanite@gmail.com


Dated:  July 4, 2026